Pidcock v. Swift.

---

JAMES N. PIDCOCK

v.

EDWIN C. SWIFT et al.

| 51 | 405 |
| 53 | 238 |
| 51 | 405 |
| 66L | 386 |

1. The general rule, both at law and in equity, is, that the party who would recover back, on the ground of fraud, whatever he has parted with under the contract, must, before bringing suit, offer to return what he has received under the contract and which he is able to return.

2. But this, like other rules of justice, must be so applied as shall best subserve, in each particular case, the undoing of wrong and the vindication of the right; hence, where a judgment debtor, under the guise of purchasing for a third person, with the money of such third person, induces his judgment creditor to assign his judgment, on a trifling consideration paid by himself, has no right to insist that his judgment creditor shall, before bringing suit to set aside the assignment, return to him the consideration paid for the assignment.

Pidcock v. Swift.

3. No man can take advantage of his own fraud, nor make his fraud the foundation of a right in his own favor.

4. A man who shuts his eyes to avoid seeing what he believes he will see if he keeps them open, will be held to have seen what he would have seen had he not shut them.

On final hearing on bill and answers and proofs taken orally.

*Mr. Louis Hood* and *Mr. Theodore Runyon*, for the complainant.

*Mr. Elwood C. Harris*, for James E. Bathgate, Jr.

*Mr. John R. Emery* and *Mr. Frederic W. Stevens*, for Edwin C. Swift.

VAN FLEET, V. C.

Two questions are at issue in this case—*first*, has the complainant a right, as a judgment creditor, to maintain this action? and, *second*, were four conveyances made by the complainant's judgment debtors in April, 1885, to the defendant Edwin C. Swift, executed under such circumstances as entitled a judgment creditor of the grantors to any relief against the deeds?

That the complainant was at one time a judgment creditor of the persons who made the deeds which are assailed is undisputed. He recovered a judgment in the supreme court of this state, on the 29th day of June, 1885, against James E. Bathgate, James E. Bathgate, Jr., and John B. Bathgate, for a sum slightly in excess of $9,000. Nor is it disputed that the complainant assigned this judgment to the defendant Edwin C. Swift on the 16th day of April, 1886. Nor can it be successfully disputed that the complainant was induced to assign his judgment by fraudulent representations, if it be true that the deeds in question are subject to successful attack by the creditors of the grantors on any ground. The consideration given for the assignment was ten per cent. in cash of the amount of the judgment, and the promissory note of James E. Bathgate, Jr., for fifteen per cent. more. The sum paid in cash was paid out of

money furnished by Mr. Swift. Nothing has been paid on the note of James E. Bathgate, Jr., so that the fact is, as matters now stand, the complainant has thus far received only one-tenth of the actual amount of his debt.

The negotiations resulting in the assignment of the judgment were conducted, on behalf of Mr. Swift, entirely by James E. Bathgate, Jr., who hereafter will, for brevity, be called James. Neither Mr. Swift nor the complainant ever uttered a single word to the other on the subject. It is undisputed that James, to induce the complainant to accept the consideration offered and assign his judgment, represented that he and the other judgment debtors had no assets—" were completely snowed under"—and that, in order to raise money enough to pay ten cents on the dollar of their indebtedness, they had to mortgage their future. The complainant alleges that these representations were false, and that instead of its being true that his judgment debtors were without assets at the time these representations were made, the truth is that Mr. Swift then held a large amount of property which they had made over to him by deeds and transfer absolutely on their face, but under a secret arrangement by which a part of the property or its value should ultimately be restored to them or to one of them. He, therefore, claims that he is not bound by the assignment, but has a clear right to relief in equity, both against the fraud which was committed when he was induced to assign his judgment and also that which was perpetrated by his debtors in attempting to conceal their property.

To the case thus made, Mr. Swift answers that, even if it be assumed that everything alleged by the complainant has been satifactorily proved, still, according to a well-settled principle, it is clear, that he is not entitled to relief. The reason assigned in support of this contention is, that the complainant, prior to the institution of this suit, neither returned nor offered to return the consideration which he had received for the assignment of his judgment. This is true. He neither returned nor offered to return the consideration. All that he has done in that regard is to submit himself, by his bill, to the direction of the court. He says that he is ready either to return the money or credit it on

his judgment, as the court may direct. There can be no doubt that the general rule, both at law and in equity, is, that the party who would recover back, on the ground of fraud, what he has parted with under the contract, must, before bringing suit, offer to return whatever he has received under the contract and which he is able to return. This rule has been repeatedly enforced by the courts of this state. *Byard* v. *Holmes, 4 Vr. 120; Guild, Executor,* v. *Parker, Receiver, 14 Vr. 430; Doughten* v. *Camden Building Loan Association, 14 Stew. Eq. 556.*

But this, like other rules of justice, must be so applied in the practical administration of justice as shall best subserve, in each particular case, the undoing of wrong and the vindication of the right. In *Guild, Executor,* v. *Parker, Receiver,* just cited, the material facts, briefly stated, were: The directors of the New Jersey Mutual Life Insurance Company, in violation of their duty, passed over to the testatrix of the plaintiff in error mortgages belonging to the corporation of the value of $15,000, in exchange for stock of the corporation of the par value of $10,000. On the delivery of the mortgages, the stock certificates were surrendered. The testatrix of the plaintiff in error acquired her stock as the legatee of her husband, who, in his lifetime, had been a director of the corporation and a promoter of the scheme under which mortgages were exchanged for stock. The corporation was subsequently adjudged to be insolvent, and a receiver was appointed to wind it up, who, without offering to return her stock, brought an action at law against the testatrix of the plaintiff in error for the value of the mortgages passed over to her, and had a recovery. A writ of error was then brought, and one of the errors assigned was, that the receiver could not maintain an action to recover the value of the mortgages until he had first rescinded the contract under which they were delivered, and that he could only do that by returning the stock or offering to do so. The court, however, repudiated this view, declaring that the rule invoked by the plaintiff in error did not apply to a suit by a trustee to recover property which had been wrongfully obtained from his *cestui que trust,* for, in the language of the court, "otherwise, the inability to

make a tender of what was not within the possession of the *cestui que trust* would often prevent an action to recover property misappropriated by the trustee. Besides, the stock itself, immediately upon the rescission, becomes hers again, and she can pursue it into the hands of those claiming to own it." This decision, while not directly on the point in dispute here, must, nevertheless, I think, be regarded as pertinent to this extent in this controversy : it shows that the courts, in dealing with the principle under consideration, so apply it as to do justice and not defeat it.

Now if it be true, as the complainant contends, that the consideration he received for the assignment of his judgment proceeded from James, and was in truth James' money, according to the real understanding between Mr. Swift and James, and that James procured the assignment to be made to Mr. Swift for his own benefit, and not for the benefit of Mr. Swift; and if it also be true, that when James induced the complainant to assign his judgment, by representing that he and the other judgment debtors were without means, the truth was that Mr. Swift held a large amount of property for them under a secret trust, it appears to me to be entirely clear, that neither Mr. Swift nor James occupies a position where either has a right to demand that the complainant shall be required to repudiate and restore before he will be permitted to maintain an action to obtain redress against their wrong. If the consideration proceeded from James, it is certain Mr. Swift has no right to its restoration. And why should it be restored to James? On what principle of justice or honesty can he demand its restoration? He has not paid his debt. The money he passed over was only one-tenth of the sum he justly owed. True, he did not pass it over as a payment, but if the money was in fact his, and he concealed that fact, and also falsely represented that he and the other judgment debtors were in a state of absolute poverty, then he passed the money over in consummation of a fraud. It was the means by which he made his fraud effectual, and he has no right, therefore, to the restoration of the money. For no rule of equity jurisprudence is better settled, or rests on higher considerations of justice and morality,

than that which declares, that no man can take advantage of his own fraud or make his fraud the foundation of a right in his own favor. In view of this principle, the utmost effect that can be given to the delivery of the money by James to the complainant is to treat it as a payment *pro tanto* on the judgment. The question whether or not the assignment of the judgment was made for the benefit of James, on a consideration which he in fact paid, can be much more conveniently and satisfactorily discussed after it has been decided whether the deeds assailed are valid or not, as absolute conveyances, against the creditors of the grantors, than at this time. For this reason the question involving the validity of the deeds will be considered first.

For several years prior to the date of the deeds in question, the complainant's judgment debtors, consisting of a father, James E. Bathgate, and his two sons, John B. Bathgate and James E. Bathgate, Jr., had carried on the business of butchers, as copartners, under the name of James E. Bathgate & Sons. James was also, at the date of the deeds, a member of a firm, composed of himself, Henry N. Swift and Edwin C. Swift, engaged in the business of selling Chicago dressed beef, on commission, in the city of Newark, under the name of the Newark Beef Company. This latter firm was formed on the 1st day of August, 1883. James held a one-half interest in it and was entitled to one-half of its profits. Whether he became a member for the benefit of James E. Bathgate & Sons or for his own benefit is in dispute; but it is undisputed that a large part of the profits he received were, immediately on their receipt, paid over by him to James E. Bathgate & Sons and used by them as their own. The Bathgates failed in April, 1885. Their unsecured debts, at that time, amounted to over $100,000, and their debts, secured by mortgages on real estate, also exceeded $100,000. They appear to have dealt with each other during the whole period of their association as though it was understood that a perfect community of property rights and interest should exist among them. Each contributed to and drew from the firm whatever he thought proper, without credit or charge, no account of any kind ever having been kept of what each put in or took

out.    The title to most of the real estate used by the firm stood in the name of the father.    Three deeds were made to Mr. Swift on the 6th day of April, 1885, one by the father, by which three tracts were conveyed.    The witnesses have called these tracts the lots on Ninth street, the canal lots and the lawn-tennis property. They were conveyed, as the deed states, subject to the taxes assessed against them from 1877 to 1884 inclusive, and also to an assessment for a local improvement which had been made against one of them.    The second deed was made by John B. Bathgate and conveyed a house and lot which was occupied by an employe of the firm.    This lot was conveyed, as the deed states, subject to a mortgage for $1,200.    Mr. Swift paid in cash for the lands conveyed by these two deeds $7,000.    The third deed was made by James and conveyed the house and lot where he resided.    The property is designated in the evidence as James' homestead.    The consideration paid for this property was $3,000, and it was conveyed, as the deed states, subject to a mortgage for $12,000 and also to the taxes which had been assessed against it for the years 1880 to 1885 inclusive.    A fourth deed was made by the father to Mr. Swift for four tracts on the 13th day of April, 1885.    These tracts have been called in the evidence the sheepskin property, the slaughter-house property, the property opposite the slaughter-house and the boiling-spring property.    Seven thousand dollars was paid as the consideration for this conveyance, and the lands were conveyed subject to all taxes in arrear and also to mortgages amounting in the total to $28,200.    On the day that this last deed was executed James sold his interest in the Newark Beef Company to Mr. Swift for $3,000.    He had acquired his interest from Mr. Swift and had agreed to pay $7,500 for it.    Of this sum he had paid $3,000 and still owed $4,500.    He sold his interest for just what he had agreed to pay for it, notwithstanding the fact that his share of the profits, which were divided monthly, had amounted, for some time prior to the sale, to about $600 a month.    The sale was consummated by the payment of $3,000 in cash and the surrender of the notes, which were held for $4,500.

The contracts, resulting in the execution of the four deeds just described, were all negotiated by James alone, neither the father nor John ever having had any direct communication with Mr. Swift on the subject. The deeds made by the father and John were executed solely upon representations made by James. John swears that James visited Mr. Swift, at the request of his father and himself, to solicit aid, and that James, after having had several interviews with Mr. Swift, finally reported that Mr. Swift had agreed to advance the three sums, he subsequently paid, and take title and carry the lands for them, and that Mr. Swift had also said that he did not want to make a mill out of the property. John further says, that he and his father executed the deeds made by them, reposing full faith in the truth of James' report. The father died in February, 1886, more than two years before the commencement of this suit, so that his testimony on this point is lost. But James denies, with great positiveness, that he made the statements attributed to him by John, but says, on the contrary, that he told his father and John, distinctly, that he had agreed to sell and Mr. Swift to buy, absolutely and unconditionally; and he and Mr. Swift both swear that that was, in fact, the real character of their contracts, and that they made no other, either expressly or tacitly, and that no such arrangement as that described by John was ever made or even suggested. These contradictory statements exhibit the test question of the case, namely, whether the deeds were executed in consummation of an unconditional sale or merely to secure advances. Evidence inherent in the transaction and growing out of the conduct of the parties has fully persuaded me that, no matter what gloss may have been attempted to be put on the transaction, the latter was, as between James and Mr. Swift, the well-understood purpose of the deeds. The case, in its most essential features, is, in my judgment, a fair duplicate of *Demarest* v. *Terhune, 3 C. E. Gr. 532,* and should therefore be decided by the rule of judgment established by that case.

The lands were conveyed for less than their fair market value. All the witnesses agree in this, those called by the defence estimating their market value, at the date of the deeds, at sums

ranging from $3,200 to $11,000 in excess of the sums advanced,. while the estimate of one of those called by the complainant shows the excess to have been $71,500, and that of another that it was $61,000. The witness who made the estimate last mentioned was employed, soon after the execution of the deeds, to make sale of the lands. At that time he had been a real estate broker for over fifteen years, and had, for all that time, dealt almost exclusively in these lands and others lying near them. After his employment he made several sales, and was still making sales when this suit was brought, and continued to do so afterwards. His connection with the property, as well as with its ostensible owner, and his thorough knowledge of the lands, would seem to entitle his estimate, if nothing appears to impugn his motives or his judgment, to very careful consideration. His motives have not been impugned, and nothing has been shown which casts the least discredit on his judgment,. except that his estimate is much higher than the estimates of other witnesses of experience and character.

There was no reason why Mr. Swift should make an unconditional purchase of these lands, at least none such as ordinarily controls the action of a man engaged in a large, widely-extended. and growing business. He was not a creditor of James E. Bathgate & Sons, and therefore in no danger of losing anything by their failure. The lands lay in the suburbs of Newark ; a large part of them was unimproved; they were mainly valuable as building sites; some of them were low and wet; these were not likely to become salable for building purposes until they could be drained by leading the water in them to a sewer; no such sewer existed; an attempt had been made to construct a public sewer in the vicinity of these lands, but natural and legal difficulties had been encountered, making it uncertain whether the attempt would not have to be abandoned; Mr. Swift did not reside in Newark and owned no real estate there; the only business interest he had there was that which he held in the firm doing business under the name of the Newark Beef Company ; he resided in Lowell, Massachusetts; he was not a real estate dealer or speculator, but was extensively engaged in slaughtering

food animals and selling their meat; he was interested in forty or fifty houses, located in different cities of the United States, where the meats of animals slaughtered and dressed in Chicago were sold; his special branch of the general business was to manage and oversee the business conducted at these different houses. Now, it appears to me, to a man thus situated, whose burdens, arising out of his ordinary business, were already about as heavy as he could bear, that the bare proposition that he should buy property of the kind indicated, at a distant point from his home, and thus increase his care and add to his perplexities, would have appeared so disagreeable and repulsive that he would have rejected it at once and peremptorily, as a thing not to be thought of. It is easy to see how a man in Mr. Swift's situation might have been willing to advance money on the security of such lands to help a friend, but it is not easy to believe that he would have agreed to purchase them unconditionally for anything like their fair market value.          .

The manner in which the lands were used and occupied and dealt with subsequent to the execution of the deeds, furnishes much stronger evidence that the deeds were executed as mortgages than as absolute conveyances. Shortly after their execution, the lawn-tennis property was leased in the name of Mr. Swift, and the Newark Beef Company used a part of the sheepskin property and also a part of the slaughter-house property for the purposes of its business. John and James were both then in the employ of the Newark Beef Company. The Bathgates retained possession of the residue of the lands and used them very much as they did before the deeds were executed up until John and James quarreled in the spring of 1887. They had the buildings insured and paid the premiums. James remained in possession of his homestead without the payment of rent or any definite arrangement upon that subject, until February, 1887, when it was reconveyed to him on the payment of $1,000 His deed has never been recorded. The consideration paid for the reconveyance was nearly $3,500 less than the property had cost Mr. Swift, not computing interest on his outlay. It will be remembered that he paid $3,000 for the prop-

erty, in April, 1885, subject to a mortgage for $12,000 and the taxes which had been assessed against it for five years. In February and March, 1886, he paid in satisfaction of these taxes and those subsequently assessed, $1,475, making his total outlay, without interest, $4,475. The reason assigned for not making an agreement when the title was transferred, respecting the amount of the rent which James should pay, is that James, shortly prior to the time he agreed to sell, had made a contract for the painting of the house, and it was therefore arranged that he should have the painting done and the premises put in good order, and that the amount he thus expended should be offset against the rent, which was to be agreed upon at some future time. But no such agreement was ever made. So far as appears, the matter was never subsequently the subject of speech or thought by either of the parties. Now, if such an understanding or arrangement actually existed, it appears to me to be so strange, as to border on the miraculous, that neither happened to mention it or even to think of it when the reconveyance was made.

But this is not the only marvelous feature of this transaction. If it was not understood, when this property was conveyed to Mr. Swift, that he should subsequently reconvey it, the reconveyance would seem to have been the offspring of a vagrant impulse rather than the result of a contract or understanding. The events which preceded the reconveyance, as they appear in the evidence, were these: A short time before the reconveyance was made James told Mr. Swift that he desired, in the near future, to repurchase his homestead; that he expected soon to receive $1,000, and that he would like to repurchase it for that sum. To this Mr. Swift replied, that he neither wanted to make nor lose on the property. James says, on this occasion, he saw Mr. Swift for a short time only, and that nothing definite was agreed upon, but as they separated, Mr. Swift said that he (James) could see him again or write to him, or he could see his attorney and have his attorney to write, and that the matter was left rather in that way. James did not see Mr. Swift again, nor did he write to him, nor did he have Mr. Swift's

attorney write, but a short time afterwards he took $1,000 to
Mr. Swift's attorney and directed him to draw a deed for the
property and then send the deed and money to Mr. Swift.   The
attorney did so; Mr. Swift received the deed and money; he
accepted the money and executed the deed and returned the
deed to his attorney, with direction to deliver it to James, and it
was delivered accordingly.   It thus appears, not only that the
reconveyance was the product of an impulse, rather than a
bargain, if it be true, as James and Mr. Swift both say, that
there was no understanding contemporaneous with the original
transfer of title that a reconveyance should be made, but it also
appears that, although Mr. Swift did not want to lose anything
by a reconveyance, the fact is that he did reconvey the property
for less than one-fourth of the amount which he had paid for it.
And he did this, as he says, under a mistake—that he supposed
he was reconveying for what he "had originally paid and any
amounts that were due for interest or taxes."   But why did he
suppose so?   How did such a fancy get into his mind?   He
had made no purchase for $1,000.   As he states the bargains,
he had made one purchase for $7,000, another for a like sum,
and a third, of James' homestead, for $3,000, and he had, in
addition, purchased James' interest in the Newark Beef Com-
pany for $3,000.   There was nothing, therefore, in his actual
transactions which made it possible for him to have confounded
one purchase with another, and thus led him to suppose that he
had paid $1,000 for this property, when the fact was that that
was the price which he had paid for another.

   In this condition of affairs, by what confusion of recollection
or other mental operation was it possible for Mr. Swift to sup-
pose that he had only paid $1,000 for James' property?   More-
over, had he forgotten that within less than a year he had paid
for taxes on this very property nearly $1,500?   And did he not
remember that the person to whom he was reconveying had
occupied the property as his tenant—for that is his claim—for
nearly two years without the payment of a single penny for
rent?   The deed by which the reconveyance was made was sent
to Mr. Swift for execution, at his home in Massachusetts, where

Pidcock v. Swift.

his books, containing an account with the property, were kept. Now, can it be believed that in a transaction involving not a few hundred dollars, but several thousand, and in respect to which he had decided what he would do, which was that he would restore the property to his grantor for such a consideration as would reimburse him for his outlay, so that he neither made nor lost, that he would have suffered himself to be controlled by a vague fancy, when he had the means at hand to ascertain, with perfect certainty, just what his outlay had been? In searching for the answer to this question, it is important to remember, that Mr. Swift was not an inexperienced, simple-minded person, who had had so little contact with the world that he was easily beguiled into making a bad bargain, but an alert, sagacious and experienced business man, who not only knew how to acquire property, but how to keep it after he got it.

And just here it is important to state, that within less than two months before the reconveyance, Mr. Swift resold to James an interest in the Newark Beef Company. According to the testimony of both James and Mr. Swift, James only succeeded in effecting the repurchase after a long and hard struggle. As a means to that end, he threatened, in a mild sort of way, to leave the services of the beef company if Mr. Swift did not resell. Mr. Swift says that he was compelled to resell. Now, during this struggle, when James was exerting his utmost skill to compel Mr. Swift to resell, and Mr. Swift was doing his best to resist him, can it be believed that Mr. Swift, in searching for means to defeat James' efforts, did not recall all his transactions with the Bathgates, and see, distinctly, what had been done in each? He and James both say that he did not want to buy James' homestead, and did so reluctantly and more for the purpose of furnishing the Bathgates with money to save their honor than with a view of making money. On the assumption that this is true, is it credible that, while James and Mr. Swift were engaged in this contest, the fact did not force itself before Mr. Swift's mind, not only vividly, but as a powerful means of resisting James' importunity that he had paid $3,000 for a thing he did not want and simply to oblige James?

27

The agreement for the resale was concluded in December, 1886. By its terms, James was to acquire, instead of a half, a one-third interest, as of the date on which he sold, together with a right to one-third of all the profits made since the date of his sale, by paying one-third of the capital, as shown by the books of the firm, with interest thereon. This contract, it will be observed, put James back, as to the interest he reacquired, just where he was at the date of his sale in April, 1885. The beef company increased its capital, on the 1st day of January, 1886, from $15,000 to $40,000, so that James was required, by his contract, to pay the one-third of $40,000, with interest. This contract was executed about the 1st day of January, 1887. The way it was executed was this: One-third of the capital, with interest, was computed at $14,358.33; James' share of the profits from the date of his sale to Mr. Swift, to January 1st, 1887, calculating interest from the date on which each division of profits was made, was computed at $9,906.46, leaving the balance due Mr. Swift, $4,451.87. In consequence of the fact that Mr. Swift agreed that the contract of resale should take place retrospectively, James obtained this extraordinary advantage: Against $1,025 of interest which he paid, he obtained, for profits and interest thereon, $9,906.46, thus giving him $8,881.46 to apply in discharge of the purchase-price of the one-third interest, and leaving him a debtor, on that account, only to the extent of $4,451.87; or, stated in another form, it appears that James obtained, in consequence of the liberal terms of his contract of repurchase, a property interest which had cost, and was unquestionably worth, over $13,000 for less than $4,500.

Another fact requires mention here. In April, 1886, Mr. Swift sent to his attorney in Newark, $12,600, to be used in the purchase of judgments and other claims against James E. Bathgate & Sons. The Bathgates, prior to the time when this money was sent, had arranged with many of their creditors to accept less than the amount due to them, and release their debts. The $12,600 was used in carrying out these arrangements. With the money, Mr. Swift sent direction that the debts which his money paid, under this arrangement, should be assigned to him.

The money consideration which the complainant received for the assignment of his judgment was paid out of this money. James made a statement, about the 1st day of January, 1887, of how his account with Mr. Swift stood on that day, in which he included the $12,600, with interest, as a part of his debt. This statement showed his total indebtedness to be $17,591.74, and was made up of the following items:

Balance due on resale of one-third interest in Newark Beef Company ................................................................................ $4,451 87
Advanced in April, 1886, .................................................... 12,600 17
Interest on the $12,600.17, to January 1st, 1887 ......................... 539 70

Making, in the whole .......................................................... $17,591 74

For this sum James made his note to Mr. Swift, dated January 1st, 1887, payable on demand, with interest, and sent the note and statement to Mr. Swift, accompanied by a letter dated January 21st, 1887. Mr. Swift accepted the note, and since then, up to February 10th, 1889, has received partial payments on it, amounting in the whole to $2,918.12. In the letter, accompanying the note and statement, James expressed the hope that Mr. Swift would find the statement correct, and then added, "if satisfactory to you, I will have your attorney draw the necessary papers for the cancellation of the judgments and mail them to you." The judgments here referred to are those which had been recovered against James E. Bathgate & Sons and assigned to Mr. Swift. Satisfaction-pieces were subsequently drawn, at the request of James, and executed by Mr. Swift, in Newark, on the 2d day of February, 1887, just two months before he executed the deed of reconveyance. Mr. Swift left the satisfaction-pieces with his attorney, with direction to hold until further instruction should be given.

It thus appears that Mr. Swift's attention, just before the reconveyance, had been called so frequently, and in so many different forms, to his transactions with the Bathgates, and especially with James, and under circumstances so strongly calculated to excite and revive his recollection, that I find it impossible to believe that he made the reconveyance under either a belief or a

supposition that the payment of $1,000 would reimburse him for his outlay, so that by the restoration of the title he neither made nor lost money. This conclusion necessarily gives the reconveyance high importance as evidence that the deeds were originally executed either to secure advances or for a less honest purpose.

As has already been stated, the lands in question were placed in the hands of a real estate broker for sale shortly after they were conveyed to Mr. Swift. James put them there. He says, all the authority the broker got from Mr. Swift he got through him, and that the broker made no sale without consulting him, unless he had previously told the broker the price which Mr. Swift was willing to take. The evidence shows that James managed and directed the sales. It also shows that he spoke to Mr. Swift as though the lands were his and not Mr. Swift's. In his letter of January 21st, 1887, already referred to, he said to Mr. Swift :

" If you could possibly arrange to spend with me a half hour at Roseville [that is the point at which the lands were located] I would very much appreciate your doing so. I would like to show you the improvements and present some things to you. I can sell the lawn-tennis grounds for $10,000. I am afraid I am, in considering it, too anxious to close the matter. If I could make sale of something else, I would be decided ; as it is, I would like to be guided by your judgment."

James says that he does not know how he happened to speak to Mr. Swift in this way, nor what exactly he meant, but his words appear to me to make his meaning plain. If Mr. Swift was the absolute owner of the lands, and James had no interest in them, why should James feel that Mr. Swift would be doing him a favor by looking at the lands and examining the improvements ? In that case Mr. Swift, by visiting and examining the lands, would simply have been giving proper attention to his own business, and doing nothing which should have called forth James' appreciation. If, however, they were jointly interested in the lands, Mr. Swift as mortgagee and James as the owner of the equity of redemption, then it is easy to see why James should highly appreciate a visit by Mr. Swift to the lands. And why

should James have fears that he was too anxious to sell the lawn-tennis property, and desire to be guided by Mr. Swift's judgment as to whether he should sell or not, if he had no interest in the property, and would neither make nor lose by a sale? In that case, the person to be troubled by anxiety and perplexed by doubts was Mr. Swift and not James. Unless James had an interest, he was seeking advice when he should have asked for commands, and was allowing himself to be perplexed about a matter that did not concern him and was none of his business. And then, too, it will be observed, that James tells Mr. Swift, quite plainly, that it is only in respect to the sale of the lawn-tennis property that he wants his advice, and that if he could have made sale of some other part of the lands he would have decided for himself and without consulting him. Looking at this letter in the light cast upon it by the evidence furnished by the conduct of Mr. Swift and James, it can, as I think, be understood in but one way, and that is as a plain assertion by James to Mr. Swift of such a right in the lands as made their sale, at an adequate price, a thing of vital importance to him. By his silence Mr. Swift acquiesced in the truth of this assertion. He does not pretend that he repudiated James' claim, or that he ever said to him that his letter asserted rights or powers that he was not entitled to. James says that, so far as he can remember, no reply was made to this letter.

But there is another fact giving still weightier evidence as to the real character of the deeds under consideration. The lands, it will be remembered, were conveyed subject to mortgages amounting altogether to $41,400. They were all overdue and all bore interest payable semi-annually or at shorter intervals. Between the date of the last deed, April 13th, 1885, and the 1st day of February, 1887, John B. Bathgate, at the request of James, paid $2,938.84 for interest on these mortgages. Thirty-six dollars were paid on April 29th, 1885, sixteen days after the execution of the last deed; $165.68 was paid on May 5th, 1885, and $360 more was paid in May, 1885, being six months on the $12,000 mortgage on James' homestead. Of the $2,938.84, $1,737.84 was paid between the 29th day of April, 1885, and

the 31st day of December of the same year; $865 was paid in
1886, and $336 during January, 1887. John swears that he
made those payments because it was the duty of his father, James·
and himself, according to the arrangement under which the lands
had been conveyed, to make them. James admits that he pro-
cured John to make them, and also that when he first requested
John to make them, John neither objected nor expressed surprise.
He also says that the reasons which induced him to procure the
payments to be made were that he thought Mr. Swift had paid
a good deal for the lands, not many sales had been made, and it
looked to him as though Mr. Swift had paid more for the lands·
than he would get out of them, and he wanted to do everything
he could to make himself "strong" with the Swifts for the
future, and that he thought by having the payments made he·
would be doing something towards the accomplishment of that
object. But it is manifest his principal reason is an invention,·
and could not have existed at the time when he says it· influenced·
his conduct, for it will be observed, that the payments com-
menced almost contemporaneously with the execution of the·
deeds, and before any sales had been made, and long before it
was possible for him to have formed a judgment as to whether·
or not it was probable the lands could be sold for sufficient to
reimburse Mr. Swift for his outlay. The first sale was made in
July, 1885—and that was made by James and not by Mr. Swift
or the broker—and prior to the date of that sale four different
payments of interest had been made, aggregating $586.

Mr. Swift says that these payments were made without his·
authority and that he had no knowledge of them until May,·
1887. On the assumption that this is true, his counsel claim
that he should not be bound by the officious intermeddling of
John and James in his affairs. That is true. He cannot be
bound by their unauthorized acts, but it is also true that he is·
bound by what it appears he must have known, and he must
also be required to bear the consequences of his own indifference·
and laches. The undisputed facts show conclusively, as I think,·
that he either knew that these payments were being made or·
willfully excluded such knowledge from his mind. If he did·

not know they were being made, it is because he shut his mind, so as not to perceive what he knew he would perceive if he kept it open. He knew that the lands had been conveyed subject to a mortgage debt more than double the sum he had invested in them; that the mortgages were all overdue and all bore interest payable at short intervals; that he was not himself paying the interest on them, and that, although the interest was falling due from time to time, none was demanded of him, nor were proceedings instituted to enforce its payment. So that, unless his mind was in a state of utter insensibility—and nothing of that kind is claimed—it is impossible to believe that the encumbered condition of the lands and the long silence and inaction of the mortgagees did not furnish him with knowledge, as certain and complete as could have been done by words, that some other person than himself was paying the interest. It is a principle of sound law, as well as of good morals, that a man who shuts his eyes to avoid seeing what he believes he will see if he keeps them open, shall be held to have seen what he would have seen had he not shut them.

On the 27th day of May, 1887, Mr. Swift repaid to James nearly the whole amount which John had paid for interest on the mortgages, and James credited the amount so repaid on John's account with the Newark Beef Company. This was done without consultation with John, and after John and James had had a quarrel, resulting in much bitterness and hate, and after danger had arisen that John would disclose the secret arrangement under which the lands had been conveyed.

From this series of facts, it seems to me it must be declared, as was declared in substance by the chief-justice, in pronouncing the judgment of the court of errors and appeals in *Demarest* v. *Terhune, 3 C. E. Gr. 532, 539*, that it is plainly consistent with sound reason and good sense to infer that the deeds in question were executed with an understanding, if not clearly expressed, at least tacit, that the grantee should sell the lands, and after reimbursing himself for his advances, pay over any surplus realized from them to one or more of his grantors. There are some facts in the case which go, to some extent, to warrant a harsher judg-

ment; which indeed go, to some extent, to prove that the deeds were executed with an actual intent on the part of both parties to defraud the creditors of the grantors. For example, the form of the conveyances being absolute, though not so in fact under the secret arrangement, enabled the grantors to represent to their creditors, with convincing force, that they were without means, and by this means induce the great body of them to accept a smaller percentage of their debts than they would have accepted had they known the truth. It also appears that James E. Bathgate, the father, at the time of his death, held a mortgage for $3,000 on real estate in the city of New York. Early in 1887 the mortgagor had an opportunity to sell the mortgaged premises, but could not complete the sale until this mortgage was canceled. He proposed to John and James to execute a new mortgage, on other real estate, in the place of the one their father had held. They consented, and directed that the new mortgage should be made to Mr. Swift. It was so made, and after its execution it was sent by James to Mr. Swift to hold. He accepted it and held it without inquiry as to why it was made to him, or for what purpose he was to hold it. His conduct manifestly laid some foundation for the belief that he was willing to assist John and James in concealing property which should be applied to the payment of their debts or to those of their father. But the conclusion that Mr. Swift accepted the deeds under consideration with an actual intent to assist the grantors in defrauding their creditors, is, in my judgment, after a careful review of all the evidence, less in consonance with the real truth of the case than that he accepted them as security for his advances. The latter will be adopted as the conclusion which is best supported by the great weight of the evidence and most in accord with the real right of the case.

The facts which must control the decision of the question, whether or not the complainant's judgment was assigned to Mr. Swift for the benefit of James, and on a consideration proceeding from James, have already been narrated. They show that the money used in paying for the assignment was James'. The money was advanced by Mr. Swift in April, 1886. Shortly

Pidcock *v.* Swift.

afterwards it was paid to the complainant, and, on the 1st day
·of January following, James gave Mr. Swift his note for it, with
interest added from the date when the money was advanced.
Mr. Swift accepted the note, and has since then received sev-
·eral partial payments on it, and he has, in addition, at James'
request, signed a satisfaction-piece directing that the judgment
be satisfied of record.   These facts show, beyond all question,
that the money used in the purchase of the judgment was the
property of James.   Mr. Swift and James have, by their own
acts, put all question on that subject at rest forever.

The complainant is entitled to a decree adjudging and direct-
ing as follows : That the assignment made by him of this judg-
ment is void; that the four deeds made to Mr. Swift were
·executed to secure advances, including the $12,600 advanced
in April, 1886 ; that an account shall be taken to ascertain the
amount remaining due to Mr. Swift, in which he must be
charged with whatever he has realized from the lands by sale or
otherwise, and also with the $1,000 received by him on the
reconveyance of James' homestead ; that an account shall also
be taken of the amount remaining due to the complainant on
his judgment, in which the judgment debtors must be credited
with the money received by the complainant on the assignment
·of his judgment; that the amount which shall be found to be
·due to Mr. Swift shall be declared to be a first lien, as between
the parties to this suit, on all the lands which were conveyed to
him, and to which he still retains the title, including James' home-
stead; and that the lands last designated, including James'
homestead, shall be sold, and out of the proceeds the amount
remaining due to Mr. Swift shall be first paid, and then so
much of the residue as may be necessary for that purpose shall
be applied to the payment of the amount remaining due to the
·complainant on his judgment, together with his taxed costs of
this suit.